**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| TOM SIMON and CYNDIE SIMON *on behalf of themselves and all similarly situated consumers*, | |
| Plaintiffs, | Civil Action No. 1:23-cv-01159 |
| v. | |
| SPECIALIZED LOAN SERVICING, LLC, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Tom Simon and Cyndie Simon, on behalf of themselves and all similarly situated consumers, file this Complaint against Defendant Specialized Loan Servicing, LLC ("SLS") and allege as follows:

**PRELIMINARY STATEMENT**

1. Mr. and Mrs. Simon purchased their home in Haymarket, Virginia in February 2006 using the predatory 80/20 mortgage loan scheme.

2. Despite being victims of this predatory lending practice, the Simons were able to save their home during the 2007-08 mortgage crisis by modifying their first mortgage through the HAMP program.

3. Mr. and Mrs. Simon worked hard to obtain a modification of their second mortgage but were not approved. Mr. and Mrs. Simon's loan servicer at the time told them that their mortgage had been marked as non-conforming and set at a zero-percent interest rate.

4. Mr. and Mrs. Simon have made any payments towards their second mortgage since 2009.

5. Their second mortgage was eventually assigned to SLS for servicing.

6. At the time that SLS received the servicing rights to the Simons' second mortgage, the mortgage had been charged off, and no one was sending the Simons monthly mortgage statements.

7. After acknowledging that their loan had a zero-percent interest rate and telling them that the outstanding balance on their second mortgage was around $95,000, SLS is now seeking to collect more than $165,000 from them.

8. SLS claims that the Simons owe this amount due to interest charges that were not previously charged to their account.

9. Because SLS's collection of retroactively assessed interest appears to be SLS's standard policy and practice, the Plaintiffs allege a class claim against SLS for making false and misleading representations about the amount of their second mortgage in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e.

10. Mr. and Mrs. Simon also allege individual claims against SLS for SLS's improper servicing of their loan, including claims under the FDCPA, § 1692f, for attempting to collect amounts not authorized by law and threatening foreclosure of their home when there was no present right to possession of the property, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e)(2), for failing to properly respond to their Qualified Written Request.

**JURISDICTION AND VENUE**

11. This Court has federal question jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1692k.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## PARTIES

13. Mr. and Mrs. Simon are natural persons who live in Haymarket, Virginia. They are consumers as defined by 15 U.S.C. § 1692a(3).

14. SLS is a foreign limited liability company with its principal place of business in Highlands Ranch, Colorado. SLS is a mortgage loan servicing company governed by RESPA.

15. SLS is also a debt collector under the FDCPA because it treated her loan as in default at the time it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355,362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003).

## FACTS

### *Zombie Second Mortgages*

16. This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

17. Prior to the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

18. But second mortgages severely harmed consumers because of high interest rates and large balloon payments due at the end of the loan.

19. Consequently, during the Great Recession, many borrowers in 80/20 mortgage schemes were required to modify their first mortgages to remain in their homes, while their second mortgages were charged off or significantly reduced or forgiven as part of the HAMP Second Lien Modification Program ("2MP Program"). *See* https://www.hud.gov/sites/documents/MAY2014MHAREPORTFINAL.PDF ("Provides

modifications and extinguishments on second liens when there has been an eligible first lien modification on the same property) (last visited Aug. 17, 2023).

20. Many of these second mortgages were charged off, meaning that they no longer incurred interest or late fees. Once charged off, consumers no longer received statements or heard anything about their second mortgages, sometimes for more than a decade, like the Simons.

21. Unbeknownst to many consumers, however, their second mortgages did not go away.

22. Instead, they were sold—often several times—to various debt buyers and subprime lenders.

23. Now, with the recent surge in housing prices, consumers have significant equity in their homes that make charged-off second mortgages highly profitable.

24. Debt buyers are now seeking to collect on defaulted second mortgages and, if consumers cannot pay, debt buyers are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding loan—which they likely bought for pennies on the dollar.

25. This highly profitable scheme has surged in recent months, as home prices have increased and COVID foreclosure moratoriums have expired.

26. The debt buyer involved—like SLS—is using the foreclosure process to collect money that it is not entitled to, essentially stealing equity from consumers who survived the initial housing crisis of any remaining equity that they have since earned in their homes.

27. Even worse, debt collectors are not collecting the amount due on the mortgages when they are charged off, as the law requires.

28. Under Truth-in-Lending-Act regulations, once a mortgage is charged off, the servicer is no longer required to send monthly statements, but it cannot assess any additional late fees or interest on the account. 12 C.F.R. § 1026.41(e)(6)(i).

29. Instead, the servicer may resume charging interest and fees on the account only if it resumes sending monthly statements, but it may not retroactively assess any fees or interest for the time during which statements were not sent. 12 C.F.R. § 1026.41(e)(6)(ii).

30. Yet services are retroactively assessing late fees and adding interest to the loans—amounts that were waived by the prior loan servicers—and are seeking to collect vastly inflated amounts from consumers.

31. In Mr. and Mrs. Simon's case, for example, their loan balance is almost $75,000 more than their original loan balance.

32. When debt collectors, like SLS, can foreclose on properties and collect these improper charges, it not only robs the consumers of their homes, but it also strips them of tens of thousands of dollars in equity—one of the primary ways that low-income and middle-class families can build wealth.

### *Mr. and Mrs. Simon's Zombie Second Mortgage*

33. Mr. and Mrs. Simon purchased their home in Haymarket, Virginia in February 2006.

34. As was common at that time, Mr. and Mrs. Simon financed their house using two mortgages.[1] Their second loan had a maturity date of March 1, 2036.

---

[1] https://www.consumerfinance.gov/ask-cfpb/what-is-a-piggyback-second-mortgage-en-1955/ (last visited Aug. 18, 2023).

5

35. Mr. Simon, who is a general contractor, has his business drastically reduced, which required the Simons to start the process of applying for a loan modification on their first mortgage.

36. In February of 2010, Mr. and Mrs. Simon's first mortgage was permanently modified under the HAMP program in effect at that time.

37. Mr. and Mrs. Simon were told that their second mortgage would be included with the first mortgage in the modification, and they initially believed this to be the case because their HAMP modification included a balloon payment at the end, which they believed at the time included their second mortgage.

38. Then, when Mrs. Simon suffered from a disability, she became no longer able to work starting in 2011.

39. Around that same time, America's Servicing Company, the then-servicer of the Simons' second mortgage, told the Simons that their loan had been charged off as a non-performing mortgage and set at a zero-percent interest rate.

40. Only then did Mr. and Mrs. Simon realize that their second mortgage was not included in the HAMP modification.

41. In February 2017, SLS acquired the servicing rights to Mr. and Mrs. Simon's second mortgage.

42. At that time, SLS sent Mr. and Mrs. Simon a letter stating that the outstanding balance on their second mortgage was $94,875, and the current interest rate was 0% with no outstanding interest due.

43. SLS also confirmed that the second mortgage had been charged off.

44. Mr. and Mrs. Simon reached out to SLS to try to make payment arrangements, but SLS refused to accept any payment amount but the full amount.

45. Mr. and Mrs. Simon then sought to modify or settle their second mortgage with SLS for many years.

46. SLS also referred Mr. and Mrs. Simon to its "preferred lender" Guardian Mortgage to refinance the second mortgage to pay off SLS.

47. Guardian Mortgage indicated that SLS told it the payoff balance was approximately $160,000.

48. Mr. and Mrs. Simon declined to continue this process, because they did not believe they owed this amount as their statements with SLS represented they only owed $94,000.

49. Mr. and Mrs. Simon continued to try to work with SLS for an option to keep their home.

50. Finally, in January 2023, SLS approved Mr. and Mrs. Simon for a modification, but required a downpayment of almost $50,000, which they could not afford.

51. In January 2023, Mr. and Mrs. Simon also received a letter from a foreclosure law firm, BWW.

52. SLS represented to Mr. and Mrs. Simon that if they refused the modification offer—which they could not afford—the home would be sent to a law firm for foreclosure.

53. Then, on February 17, 2023, SLS sent Mr. and Mrs. Simon a monthly statement stating that the total amount due on their loan was $165,691.80, which increased the amount due on the loan by nearly $70,000 in one month.

54. Mr. and Mrs. Simon were extremely confused when they received this statement.

55. They called SLS and asked why their loan balance had increased almost $70,000, and SLS explained that it had retroactively added interest to the account.

56. Both the amount listed in SLS's monthly statement and the statements that SLS made to the Simons were false—the Simons did not owe any past due interest because the loan had been charged off and the interest rate was 0%.

57. SLS also sent the Simons a monthly statement on March 17, 2023 stating that they owed $166,660.84 for their second mortgage.

58. Again, this statement was false because it included retroactively assessed interest that they did not owe.

59. The Simons sent SLS a Qualified Written Request on April 3, 2023.

60. This letter contained all of the necessary information to be considered a Qualified Written Request, including the Simons' personal information and the loan information, and was sent to the address that SLS has designated for Qualified Written Requests.

61. The Simons' Qualified Written Request disputed the inaccurate assessment of almost $70,000 in interest and asked SLS to remove the improper charges from their account.

62. The Simons' Qualified Written Request also asked that SLS provide them with: (1) an explanation of the amounts listed on their February 17, 2023 monthly statement; (2) a breakdown of all amounts SLS contended was due on the loan; (3) the servicing notes for the loan; and (4) any telephone records for the loan since January 1, 2023.

63. SLS responded to the Simons' Qualified Written Request on May 8, 2023.

64. SLS's response stated that the amount listed on the Simons' monthly statement was an internal error in SLS's system, to disregard it, and to rely on the amount that was listed in the payoff statement:

> There is a SLS system issue that reflects when the loan reaches full amortization; the total amount due will continue to add the principal and interest payments on the billing statements. The payoff statement issued above reflects the correct and valid amounts due as there is no interest being accrued or applied to the loan. We regret any confusion regarding this matter.

65. But the Simons' second mortgage did not mature until March 1, 2036, so this explanation appears to be erroneous. It also contradicts SLS's prior representations that the additional charges were due to unapplied interest.

66. SLS's Qualified Written Request response also indicated that SLS would not provide the Simons with any of the servicing notes or telephone recordings that they had requested because this information was "proprietary."

67. After SLS responded to the Simons' Qualified Written Request, it did not correct the servicing error in its system. Instead, it continued to send monthly statements to the Simons indicating that they owed more than $169,000 for their second mortgage.

68. For example, on May 17, 2023, SLS sent the Simons a monthly mortgage statement stating that the total amount due on their second mortgage was $169,423.92.

69. And on June 12, 2023, SLS sent the Simons a monthly mortgage statement stating that the total amount due on their second mortgage was $170,543.96.

70. By SLS's own admission, these statements were false.

71. During this time, SLS also referred the Simons' second mortgage to foreclosure and scheduled a foreclosure sale for July 25, 2023.

72. The attempted foreclosure of the Simons' home was illegal because SLS was attempting to collect the incorrect amount of the debt from the Simons and because there was no present right to possession of the property.

73. Because of SLS's conduct, the Simons have suffered actual damages, including significant emotional distress caused by the demands for payment of nearly $70,000 they do not owe and the fear of losing a home where they have lived for almost 20 years.

## COUNT ONE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692e(10)
(Class Claim Against SLS)

74. Mr. and Mrs. Simon incorporate the preceding allegations.

75. Under Federal Rule of Civil Procedure 23, Mr. and Mrs. Simon bring this action for themselves and on behalf of the following class:

> All consumers: (1) with a non-performing loan owned by SLS; (2) to whom SLS sent correspondence in the one year predating the filing of this lawsuit; (3) seeking to collect interest assessed by SLS for time periods when SLS's records indicate that the interest rate was zero percent.

76. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Mr. and Mrs. Simon allege that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS services thousands of non-performing loans and subjects all of them to the same procedures for the retroactive assessment of interest. The class members' names and addresses are identifiable through SLS's internal business records, and they may be notified of this litigation by published or mailed notice.

77. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether SLS is a debt collector; (2) whether SLS violated § 1692e of the FDCPA by making false representations about Mr. and Mrs. Simon's and putative class members' debts; and (3) the appropriate amount of statutory damages.

78. **Typicality. Fed. R. Civ. P. 23(a)(3).** Mr. and Mrs. Simon's claims are typical of the claims of each putative class member. They are also entitled to relief under the same causes of

action as the other putative class members. All claims are based on the same facts and legal theories.

79. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4)**. Mr. and Mrs. Simon are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Mr. and Mrs. Simon have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Mr. and Mrs. Simon and their counsel will fairly and adequately protect the putative class members' interests. Neither Mr. and Mrs. Simon nor their counsel have any interests that might cause them to not vigorously pursue this action.

80. **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

81. SLS violated § 1692e(10) of the FDCPA by using false representations to collect or attempt to collect debts from Mr. and Mrs. Simon and the putative class members.

82. For example, SLS falsely represented that Mr. and Mrs. Simon and the putative class members owed interest, even though the interest rate for their loans was zero percent.

83. SLS's statements were false. Mr. and Mrs. Simon and the putative class members did not owe this interest because their interest rate was zero percent and SLS was not permitted to retroactively assess interest.

84. Mr. and Mrs. Simon and each putative class member suffered a concrete injury in fact because of SLS's misrepresentation including, for example, an adverse impact on debt-making decisions and emotional distress.

85. In addition, some class members suffered actual damages when they paid these improper fees to SLS.

86. Under 15 U.S.C. § 1692k, Mr. and Mrs. Simon seek actual and statutory damages for themselves and each putative class member and their reasonable attorneys' fees and costs. They also seek actual damages for the class members in the amount of the improper fees that they paid to SLS.

## COUNT TWO:
### Violation of FDCPA, 15 U.S.C. § 1692f
### (Individual Claim Against SLS)

87. Mr. and Mrs. Simon incorporate the preceding allegations.

88. SLS's conduct towards Mr. and Mrs. Simon violated several provisions of 15 U.S.C. § 1692f.

89. First, SLS violated 15 U.S.C. § 1692f(1) when it attempted to collect retroactively assessed interest, which was not permitted by law.

90. Second, SLS violated 15 U.S.C. § 1692f(6) attempting to foreclose on Mr. and Mrs. Simons' property. SLS did not have any present right to possession of the property at the time that

it scheduled the foreclosure sale because neither SLS nor its agents ever sent the Simons a notice that complied with Va. Code § 55.1-321.

91. Because of SLS's violations of 15 U.S.C. § 1692f, Mr. and Mrs. Simon suffered actual damages, including significant emotional distress.

92. Based on SLS's violation of § 1692f, Mr. and Mrs. Simon are entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

### COUNT THREE:
### Violation of RESPA, 12 U.S.C. § 2605(e)(2)
### (Individual Claim Against SLS)

93. Mr. and Mrs. Simon incorporate the preceding allegations.

94. As alleged above, Mr. and Mrs. Simon submitted a qualified written request to SLS, and SLS received the request.

95. SLS violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to the Simons' account, including removal of the improper interest from their account.

96. SLS also violated 12 U.S.C. § 2605(e)(2) by failing to provide the Simons with most of the information they requested or to explain why the requested information was unavailable.

97. Because of SLS's conduct, the Simons suffered concrete and particularized harm, including: assessment of fees and charges that they did not owe, and emotional distress, including aggravation and stress.

98. Upon information and belief, discovery will reveal that SLS's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

99. SLS has also been sued multiple times for failing to properly respond to Qualified Written Requests, including by failing to conduct proper investigations or provide information.

100. In addition, the Consumer Financial Protection Bureau's consumer complaint portal shows that 7,464 mortgage-related complaints have been filed against SLS as of August 23, 2023, including 134 complaints for failing to investigate an existing problem.

101. Mr. and Mrs. Simon are entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

## PRAYER FOR RELIEF

WHEREFORE, Mr. and Mrs. Simon, on behalf of themselves and the putative class members, move for class certification and for statutory and actual damages, as well as their attorneys' fees and costs as pleaded above against SLS for the class claim, as well as actual and statutory damages, and attorneys' fees and costs for their individual claims; for pre-judgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,
**PLAINTIFFS**

By: ___*/s/ Andrew J. Guzzo*_____
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
*Counsel for Plaintiffs*